IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| KARSTEN O. ALLEN, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 7:21cv00641 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| B. HURLEY, *et al.*, | ) | By:   Hon. Thomas T. Cullen |
| | ) |          United States District Judge |
| Defendants. | ) | |

Karsten O. Allen, a Virginia inmate proceeding *pro* se, filed this civil action under 42 U.S.C. § 1983, alleging that the defendants filed a false disciplinary charge against him as retaliation, denied him due process at the disciplinary hearing, and subjected him to cruel and unusual living conditions. The defendants have moved for summary judgment, arguing that Allen failed to exhaust administrative remedies as to his claims and that his allegations nevertheless fail to state viable due process or living conditions claims. Having reviewed the record, the court agrees and will grant the defendants' motion for summary judgment.

I.

Allen alleges that on October 13, 2020, while housed at Keen Mountain Correctional Center ("Keen Mountain"), after he passed through a metal detector "without incident," a non-defendant officer ordered him to remove his medical wrist brace to be checked for a "metal strip." (Compl. at 3–4 [ECF No. 1].) Allen claims that he "protested" the officer's order because the officer "had no knowledge of his medical condition to make an order to remove something ordered by a doctor, nor [did he have] the medical authority to override a doctor's order to wear the brace 'at all times.'" (*Id.* at 3.) In response, the officer allegedly

stated that he "d[id]n't care," he does "whatever [he] want[s] to do," and that this was Keen Mountain where "[t]he officers run this place." (*Id.* at 4.) Allen claims that he subsequently removed the brace and told the officer to "advise the sergeant that he wanted a complaint form." (*Id.*) The officer allegedly responded by explaining to Allen that "as an officer, he had the 'right' to search anything at the facility regardless of medical concerns because security came first." (*Id.*) Allen claims that the officer than began "shouting obscenities" toward him. (*Id.*) While this was happening, Allen alleges that defendant Officer Hurley was standing in the doorway and shouted that Allen should "shut [his] damn mouth or [he could] go back to the pod." (*Id.*) As Allen turned to go back to the pod, he told Officer Hurley to "get two complaint[ forms] from the s[ergean]t so he could include [Hurley in his complaints] also." (*Id.* at 5.) As Allen progressed through the vestibule, he arrived at the pod door and pressed a button to alert the booth officer to let him in. Allen claims that Officer Hurley used his radio to tell the booth officer to not let Allen in and then "charged at" Allen yelling, "[Y]ou threatening us?" (*Id.*) Allen states that he "ignored the taunting and told Hurley to get the sergeant." (*Id.*) Two non-defendant officers allegedly "came to Hurley's side aggressively surrounding [Allen] in an attempt of intimidation." (*Id.*) Allen states that Officer Hurley ordered him to the middle of the vestibule, where Allen "was met with a K-9 officer and the animal." (*Id.*) Officer Hurley called for defendant Unit Manager ("UM") Fields and then told Fields that Allen was making threats against "all of [them]." (*Id.*) UM Fields allegedly asked what Allen had said and Officer Hurley responded that Allen was "threatening to write [them] up and file lawsuits." (*Id.* at 6.) UM Fields instructed officers to take Allen to segregation and they did.

Later that day—and based on a "referral" from UM Fields—defendant UM Shelton submitted an Institutional Classification Authority ("ICA") Referral Notice indicating that Allen was placed in the restricted housing unit ("RHU") on general detention status, that he had a "pending" disciplinary infraction for "threatening bodily harm to any person," and that he would be referred to the Multi-Disciplinary Team ("MDT") hearing committee for an appropriate housing assignment. (ECF No. 1-1 at 1.) Allen asserts that, later that evening, Officer Hurley submitted a "falsified" disciplinary offense report alleging a "new version of the events" and changing the infraction to "gathering around or approaching any person in a threatening or intimidating manner."[1] (Compl. at 6.) Allen states that the "falsified disciplinary report was reviewed, investigated, and approved by" defendant Lt. Horne, and that UM Fields "authorized" Allen's placement in the RHU. (*Id.* at 7.)

Two days later on October 15, 2020, Allen attended an ICA hearing for the MDT to "determine his housing status." (*Id.*) Allen claims that defendant Whitt, the Chief of Housing and Programs, and UM Shelton were members of the MDT. At the hearing, Allen stated that he "didn't do that. [He didn't] know who that person [was]. If [he] did what is sa[id], there's no way [he] would have gone to the hole. [He] said something to that nature, but it wasn't anything close to that. If [they would] look at the camera [they'd] see it [was] nothing like

---

[1] The disciplinary offense report states that on October 13, 2020, to "make sure there was no contraband," Officer Hurley asked Allen "to remove the wrist brace on his right hand prior to exiting the building to enter the recreation yard" and Allen "refuse[d] multiple direct orders." (ECF No. 16-2 at 44.) Officer Hurley states that Allen "approached [him] in a threatening man[ner] by aggressively throwing his hands up and then pointing at [him] and stating, 'You all do not run this place you all will find out,' 'all you got to do is ask around about me,' [and] 'you're gonna find out.'" (*Id.*) Allen was then placed in mechanical hand and leg restraints and placed in the restricted housing unit.

that."[2] (ECF No. 1-1 at 1.) The MDT recommended Allen's placement in RHU "based on recent disruptive behavior that resulted in [Allen] receiving a [disciplinary] infraction." (*Id.*) Defendant Assistant Warden McCoy approved the MDT's recommendation.

Allen claims that he remained in the RHU from October 15, 2020, to October 28, 2020. He argues that the conditions of the RHU were "differ[ent]" from general population housing in that he was required to be restrained whenever he left his cell, that he was confined to his cell except for during showers and outside recreation, that his telephone and kiosk privileges were "severely limited to two times per month," and that he did not have other privileges such as commissary, television, personal clothing, and "other pleasantries."[3] (*Id.* at 7–8.)

A disciplinary hearing was conducted on January 13, 2021. Allen claims that before watching the video recording, defendant Institutional Hearing Officer ("IHO") Lowe asked him if he "was sure he wasn't going to plead guilty for a lesser penalty." (*Id.* at 8.) Allen states that when he "refused," IHO Lowe and Officer Hurley "sarcastically and mockingly" told Allen that they were "good" friends. (*Id.* at 8–9.) Allen claims that, during the hearing, Officer Hurley testified to the statements in the disciplinary offense report but added that Allen "swung his fists at him," attempting an assault.[4] (*Id.* at 9.) Allen claims that he asked Officer Hurley if there were any false or incorrect statements in the disciplinary offense report and

---

[2] Allen alleges in his complaint that "the camera in the vestibule" establishes "a clear video record of the events." (*Id.*) The court notes that, if any video recording exists, it is not part of the current record but is nevertheless immaterial to the court's adjudication in this Opinion.

[3] In addition, Allen states that RHU inmates were required to complete writing assignments and the consequence for not completing them was a "major disciplinary infraction," which he claims could result in an inmate's ineligibility for a reduction in security level, increase in security level, decrease in good-time earning level, and a fine. (*Id.*) Allen does not allege that any of this happened to him, though.

[4] The court notes that the Disciplinary Offense Report stated that Allen "aggressively thr[ew] his hands up." (ECF No. 1-1 at 2.)

Hurley said there was not. Allen states that he testified to his "own version of the events" and that Hurley had "falsified the report in retaliation for [Allen] refusing to 'shut [his] mouth' and requesting the complaint and lawsuit." (*Id.*) Allen claims that he told IHO Lowe that there was a camera in the vestibule that would provide "irrefutable evidence that the officer was falsifying the allegations" and asked that it be entered into evidence, but IHO Lowe refused the video and stated that Allen had "failed to submit the proper paperwork.[5] Allen states that he also requested witnesses but IHO Lowe determined the witnesses' testimony to "be irrelevant."[6] (*Id.* at 10.) Finally, Allen claims that he requested to submit the ICA Referral Notice that "clearly showed that [Officer] Hurley gave UM Fields a different version of events than what he submitted in the disciplinary offense report," but IHO Lowe "irrationally and egregiously stated that the discrepancy could be counted as a 'mistake.'" (*Id.*) Ultimately, IHO Lowe found Allen guilty of the disciplinary infraction and imposed a $15 fine as punishment for the infraction. Lowe stated that his decision was "[b]ased on a preponderance of the

---

[5] Allen states that he advised IHO Lowe that he was "prohibited" from requesting the video before the hearing because he was "required" to request it during the hearing, but IHO Lowe "simply refused." (*Id.*) In his disciplinary appeal, Allen states that his documentary evidence was denied because he failed to file a "non-exist[ant]" form. [ECF No. 20-2 at 4.] However, Virginia Department of Corrections' ("VDOC") Operating Procedure ("OP" )861.1 states that an inmate should submit any Request for Documentary Evidence within 48 hours of the charge being served and that failure to submit the form within that time is a waiver of the inmate's right to request the documentary evidence, absent good cause shown. VDOC OP 861.1 §XII.B.2 (ECF No. 16-2 at 29). In response to his disciplinary hearing appeal, the Warden note that OP 861.1 required that documentary evidence requests be submitted on the forms and that the forms are "readily available from a miscellany of sources to include pod aids, Unit Managers and the IHO." (ECF No. 20-2 at 6.) Allen does not allege that he submitted the Request for Documentary Evidence form or that there was good cause for his failure to timely do so.

[6] Allen sought to call an inmate and UM Fields as witnesses. (ECF No. 16-2 at 48.) Allen alleges that IHO Lowe stated that the inmate witness's testimony was irrelevant because Allen could not identify the inmate by name. Allen believes that a review of the video footage could identify the inmate because there was only one other inmate in the vestibule at the time of the incident. Allen also sought to call UM Fields as a witness to testify as to the statement that Officer Hurley had provided to him after the incident that led to UM Fields initially filing a charge for threatening bodily harm to any person. Allen argues that IHO Lowe "irrationally reasoned" that because UM Fields was not present at the time of the incident, his testimony was not relevant. (Compl. at 10.)

evidence, a valid disciplinary offense report, the testimony of the reporting officer that the accused gather[ed] around or approach[ed] any person in a threatening manner, by approaching the reporting officer in an aggressive manner with his hands waiving in the air and making the statements in the body of the charge," and that Allen "did not offer any defense to refute the charge." (ECF No. 1-1 at 5.) Allen appealed the conviction; defendants Warden Younce and Regional Administrator Manis upheld the conviction on both levels of appeal.

## II.

Federal Rule of Civil Procedure 56(a) provides that a court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "As to materiality, . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is inappropriate "if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see also JKC Holding Co. v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001). But if the evidence of a genuine issue of material fact "is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249−50 (internal citations omitted). In considering a motion for summary judgment under Rule 56, a court must view the record as a whole and draw all reasonable inferences in the light most favorable to the nonmoving party. *See id.* at 255; *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994). The non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to

defeat a motion for summary judgment. *Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 874–75 (4th Cir. 1992). The evidence relied on must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits." *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1315–16 (4th Cir. 1993) ("The summary judgment inquiry thus scrutinizes the plaintiff's case to determine whether the plaintiff has proffered sufficient proof, in the form of admissible evidence, that could carry the burden of proof of his claim at trial."); *Sakaria v. Trans World Airlines*, 8 F.3d 164, 171 (4th Cir. 1993) (finding that the district court properly did not consider inadmissible hearsay in an affidavit filed with motion for summary judgment).

Although the court does not make credibility determinations when adjudicating a motion for summary judgment, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Smith v. Ozmint*, 578 F.3d 246, 254 (4th Cir. 2009) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

### III.

Allen claims that the defendants deprived him of due process at his disciplinary hearing by denying him witnesses, documentary evidence, an impartial decision maker, and an "adequate reason" for the decision.[7] The court concludes that no due process right was

---

[7] Under OP 866.1, disciplinary hearing decisions, penalties, and/or procedural errors are non-grievable matters under the VDOC's established Offender Grievance Procedure; they may be appealed under a separate process outlined in OP 861.1, Offender Discipline, Institutions. VDOC OP 866.1 §IV.M.2 (ECF No. 16-1 at 11). The court concludes that Allen's current due process claims were not grievable under OP 866.1 but were exhausted under the appeal procedure in OP 861.1. Therefore, the court will address the merits of Allen's due process claims. But the court notes that Allen's retaliation and conditions claims were grievable under OP 866.1 and, therefore, will be addressed accordingly.

implicated by the hearing and, therefore, will grant the defendants' motion for summary judgment as to the due process claims.

The Due Process Clause of the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. "To state a procedural due process violation, a plaintiff must (1) identify a protected liberty or property interest and (2) demonstrate deprivation of that interest without due process of law." *Prieto v. Clarke*, 780 F.3d 245, 248 (4th Cir. 2015). In other words, a plaintiff must identify a sufficient liberty or property interest before the court examines whether the procedures attendant to its deprivation were constitutionally sufficient. *Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989). In the context of prisons, an inmate typically can demonstrate a protected interest by showing an "atypical and significant hardship . . . in relation to ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995).

Here, Allen was convicted of "gathering around or approaching any person in a threatening or intimidating manner" at a disciplinary hearing and fined $15. (ECF No. 1-1 at 5.) Allen contends that he has a protected property interest in "the funds in his inmate account," which includes the $15 fine. (Compl. at 14.) The court disagrees. While neither the Supreme Court nor the Fourth Circuit has specified the threshold at which the Due Process Clause is implicated when it comes to monetary fines, several Judges in this district have held that small fines routinely assessed at disciplinary hearings do not trigger due process protections. *See, e.g.*, *Roscoe v. Mullins*, No. 7:18cv132, 2019 U.S. Dist. LEXIS 154091, 2019 WL 4280057, at *3 (W.D. Va. Sept. 10, 2019) (granting summary judgment in defendants' favor as to the due process claim where the only penalty was a $15 fine), *aff'd on other grounds*, No. 19-

7343 (4th Cir. Oct. 28, 2020); *Ferguson v. Messer*, No. 7:15cv140, 2017 U.S. Dist. LEXIS 47334, 2017 WL 1200915, at *8 (W.D. Va. Mar. 30, 2017) (concluding that three $12 fines did not give rise to a protected property interest); *Bratcher v. Mathena*, No. 7:15cv500, 2016 U.S. Dist. LEXIS 105306, 2016 WL 4250500, at *1 (W.D. Va. Aug. 10, 2016) (finding $12 fine did not impose an atypical and significant hardship on the plaintiff in comparison to the ordinary incidents of prison life and so did not constitute a property interest). *But see Bowling v. Clarke*, No. 7:19cv453, 2020 U.S. Dist. LEXIS 133010, 2020 WL 4340944, at *5 (July 28, 2020) (denying summary judgment and noting that, "[a]rguably, however, the imposition of that fine, which was deducted from [the plaintiff's] inmate account after an allegedly defective disciplinary hearing, constituted the deprivation of a protected property interest without due process"). Consistent with this persuasive authority, the court concludes that Allen's $15 fine was not an "atypical and significant hardship" that triggered due process protections. *See Sandin*, 515 U.S. at 484.

Because Allen has failed to allege a protected liberty or property interest that was implicated by the defendants' actions, the court declines to examine the sufficiency of the process afforded to him at the disciplinary hearing. *See Kentucky Dep't of Corr.*, 490 U.S. at 460. For this reason, the court will grant the defendants' motion for summary judgment as to Allen's due process claims.[8]

---

[8] Even if a $15 fine triggered a due process right, though, the defendants would nevertheless be entitled to qualified immunity. The doctrine of qualified immunity protects government officials from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). To determine whether an official is entitled to qualified immunity, the court must first determine whether the facts, taken in the light most favorable to the plaintiff, show that the defendant's conduct violated a constitutional right. *Smith v. Ray*, 781 F.3d 95, 100 (4th Cir. 2015). Second, the court must evaluate whether the right was clearly established at the time of the defendant's conduct. *Smith*, 781 F.3d at 100. As discussed previously, judges of this district have

### IV.

Allen also alleges that the defendants retaliated against him and subjected him to cruel and unusual living conditions. The defendants argue that Allen failed to exhaust available administrative remedies as to these claims before filing this action, as required by 42 U.S.C. § 1997e(a). The court agrees and will grant the defendants' motion for summary judgment as to these claims.

### A.

The Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." § 1997e(a). "[E]xhaustion is mandatory under the PLRA and . . . unexhausted claims cannot be brought in court." *Jones v. Bock*, 549 U.S. 199, 211 (2007) (citing *Porter v. Nussle*, 534 U.S. 516, 524 (2002)). A prisoner must exhaust all available administrative remedies, whether or not they meet federal standards or are plain, speedy, or effective, and even if exhaustion would be futile because those remedies would not provide the relief the inmate seeks. *Davis v. Stanford*, 382 F. Supp. 2d 814, 818 (E.D. Va. 2005).

Ordinarily, an inmate must follow the required procedural steps to exhaust his administrative remedies. *Moore v. Bennette*, 517 F.3d 717, 725 & 729 (4th Cir. 2008); *see Langford*

---

determined that $12 and $15 fines assessed at disciplinary hearings do not trigger due process. Moreover, neither the Fourth Circuit nor the Supreme Court has held that the imposition of a $15 fine for a disciplinary infraction triggers due process concerns. It follows that no reasonable official would have known of any possible violation of constitutional rights even if this court were to conclude that imposing such a fine in this instance gave rise to one. *See, e.g.*, *Bowling v. Clarke*, No. 7:19cv453, 2021 U.S. Dist. LEXIS 22976, 2021 WL 440794 (W.D. Va. Feb. 8, 2021) (reaffirming an earlier ruling that a $15 fine triggered due process protections but concluding that defendants were nevertheless entitled to qualified immunity on this issue).

*v. Couch*, 50 F. Supp. 2d 544, 548 (E.D. Va. 1999) ("[T]he second PLRA amendment made clear that exhaustion is now mandatory."). An inmate's failure to follow the required procedures of the prison's administrative remedy process, including time limits, or to exhaust all levels of administrative review is not "proper exhaustion" and will bar the claim. *Woodford v. Ngo*, 548 U.S. 81, 90 (2006). But the court is "obligated to ensure that any defects in administrative exhaustion were not procured from the action or inaction of prison officials." *Aquilar-Avellaveda v. Terrell*, 478 F.3d 1223, 1225 (10th Cir. 2007); *see Kaba v. Stepp*, 458 F.3d 678, 684 (7th Cir. 2006). Accordingly, an inmate need only exhaust "available" remedies. § 1997e(a). An administrative remedy is not available "if a prisoner, through no fault of his own, was prevented from availing himself of it." *Moore*, 517 F.3d at 725.

## B.

In support of the defendants' motion for summary judgment, Grievance Coordinator K. Breeding provided: an affidavit; Virginia Department of Corrections' ("VDOC") Offender Grievance Procedure, Operating Procedure ("OP") 866.1; and Allen's relevant grievance records. (*See* ECF No. 16-1.) OP 866.1 details the grievance process by which offenders must resolve complaints, appeal administrative decisions, and challenge the substance of procedures. Grievance Coordinator Breeding explains that the grievance process provides corrections staff a means to evaluate potential problem areas and, if necessary, correct those problems in a timely manner. There is no dispute that Allen's retaliation and living conditions complaints are subject to the well-established requirements of OP 866.1.

Prior to submitting a regular grievance, an inmate must demonstrate that he has made a good-faith effort to resolve his complaint informally. According to OP 866.1, the first stage

of the informal complaint procedure is for the inmate to verbally communicate his concerns to staff. If the issue is not resolved or the inmate is not satisfied with the resolution, he generally must document his good-faith effort using an informal complaint form. Once an inmate files an informal complaint form, it is logged in VACORIS, the VDOC's computer-based offender information management system, and a receipt is issued to the inmate. Within 15 days of receipt of the informal complaint form, staff should respond to the informal complaint. If an inmate is not satisfied with the staff's response to the informal complaint, he may file a regular grievance. Or, if no response is given to the inmate within 15 days of the logging of the informal complaint form, the inmate may file a regular grievance, and he must attach the receipt of the informal complaint form to the grievance as documentation of his attempt to resolve the issue informally. The inmate is responsible for submitting the informal complaint in a timely manner to allow time for staff to respond within the time period allowed to file a regular grievance.

A regular grievance generally must be filed within 30 days from the date of the incident. Regular grievances are date-stamped on the working day they are received. If the grievance meets the criteria for acceptance, it is logged in VACORIS and receipt is issued to the inmate within two working days from the date the grievance is received. If the grievance does not meet the criteria for acceptance, the grievance is returned to the inmate within two working days of its receipt, along with an explanation for why the grievance was rejected at intake. Intake rejections can be appealed to the Regional Ombudsman within five calendar days of receipt. The Regional Ombudsman's review of the intake decision is the final level of review.

If a grievance is accepted at intake, it may proceed through up to three levels of review. Grievances must be appealed through all available levels of review to satisfy the requirement of exhaustion before filing a § 1983 lawsuit. Level I reviews are conducted by the Warden or Superintendent of the prison. If the inmate is dissatisfied with the determination, he may appeal the determination to Level II. Level II responses are provided by the Regional Administrator, Health Services Director, Chief of Operations for Offender Management Services, or Superintendent for Education. For most issues, Level II is the final level of review. For those issues appealable to Level III, the Chief of Corrections Operations or Director of the VDOC conducts a review of the regular grievance. The time limit for issuing a Level I response is 30 days, 20 days for a Level II response, and 20 days for a Level III response. Expiration of the time limit (including any authorized continuances) without issuance of a response at any stage of the process automatically qualifies the grievance for appeal.

## C.

In her affidavit, Grievance Coordinator Breeding states that she reviewed Allen's grievance file at Keen Mountain for those related to Allen's allegations that he was involved in a verbal altercation with officers on October 13, 2020, had a "false" disciplinary charge filed against him, and was placed in RHU where he no longer had the privileges typically afforded to inmates in general population housing. (Aff. of K. Breeding ¶¶ 3, 10, Mar. 14, 2022 [ECF No. 16-1].) Grievance Coordinator Breeding avers that Allen did not exhaust the administrative remedies available to him as to these claims. (*Id.* ¶ 15.)

The undisputed evidence shows that Allen submitted two informal complaints concerning the allegations in his complaint. In an informal complaint dated October 14, 2020,

Allen stated that he was put in segregation on October 13, 2020, an officer refused to let him see the list of his property before signing the property inventory form, and Allen refused to sign the form. (*See* ECF No. 16-1 at 21.) Allen alleged that when he did get a copy of the form, it was missing "at least a dozen items." (*Id.*) The October 29, 2020 response to the informal complaint confirmed that the officer reported that Allen had refused to sign the inventory form.

In an informal complaint dated October 20, 2020, Allen complained that he was "given a false charge by Officer Hurley" as "retaliation" and that he was placed in the RHU as "punishment." (ECF No. 16-1 at 22.) The November 4, 2020 response to the informal complaint states that, the complaint "has no detail of the incident or how it has hindered [his] rights to petition the courts." (*Id.*)

But Grievance Coordinator Breeding testified that Allen did not submit any regular grievances that were accepted during intake regarding the factual allegations underlying this lawsuit, nor did he submit any regular grievances that were rejected during the intake process. (Breeding Aff. ¶ 16). Allen has not provided any verified evidence to rebut Breeding's affidavit. Accordingly, the court concludes that Allen did not fully exhaust administrative remedies as to his retaliation and living conditions claims. Therefore, the court next considers whether administrative remedies were "available" to Allen.

In his unverified respond to the defendants' motion for summary judgment, Allen argues that Grievance Coordinator Breeding "interfered with the process by refusing to respond" to his grievances or requests for responses. But Allen does not provide specific details about these alleged submissions or Breeding's purported refusal, and he provides no

*verified* evidence, such as a sworn declaration with specific details, to back-up his assertion.[9] Allen has thus not presented any material fact on which he could persuade a reasonable factfinder that he was prevented from properly exhausting available administrative remedies "through no fault of his own"; thus, the court concludes that administrative remedies were available to Allen as to these claims. Finding no genuine dispute of material fact, the court concludes that Allen failed to exhaust available administrative remedies concerning his retaliation and living conditions claims and the defendants are entitled to judgment as a matter of law as to these claims.

## V.

For the reasons stated, the court will grant the defendants' motion for summary judgment.

The clerk shall send copies of this Memorandum Opinion and Order to the parties.

**ENTERED** this 14th day of March, 2023.

/s/ *Thomas T. Cullen*
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE

---

[9] In his "objection" to the motion for summary judgment, Allen states that he "supports [his] objection with a sworn affidavit, a statement identifying the material facts that are in dispute, supporting material, and a memorandum of law asserting the legal argument of the issues." (ECF No. 20 at 1.) Attached to the objection, the court received a 19-page memorandum and attachments labeled "A" through "M." (ECF Nos. 20-1 & 20-2.) The memorandum includes a "Statement of [the] Case," "Statement of Disputed Facts," and Allen's "Argument." (ECF No. 20-1.) There is also a section in the memorandum titled "Affidavit and Evidence." (*Id.* at 3.) In that section, Allen states that he "submits a sworn affidavit and supporting evidence cited as 'attachments' in support of the contentions stated in [the] memorandum." (*Id.*) Attachments "A" through "M" consist of grievance records, disciplinary appeal records, and a portion of VDOC OP 802.2. (ECF No. 20-2.) Some of these attachments are related to his claims and others that are not. But neither the memorandum nor any of the attachments are verified. The only verified statement in the record, *i.e.*, sworn to under penalty of perjury, is Allen's complaint and the complaint does not address Grievance Coordinator Breeding's alleged refusal to accept and/or process his complaints and grievances.